# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

PATRICIA DUKERT, Individually
and as Personal Representative of the
Estate of Clare William Dukert,

        Plaintiff,

        v.                                     Civil No. 14-506 WJ/WPL

UNITED STATES OF AMERICA,

        Defendant.

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CASE is a wrongful death action filed by Patricia Dukert ("Plaintiff"), Individually and as Personal Representative of the Estate of Clare William Dukert, against the United States of America ("Defendant") as a result of alleged medical malpractice by physicians at the Veterans Administration ("VA") who treated the late Clare William Dukert ("Mr. Dukert"). Trial on the merits was conducted before the undersigned from September 7-9, 2016. After having considered all of the evidence and testimony presented at trial, after reviewing the parties' pre-trial and post-trial submissions (Docs. 66, 67, 74, 75, 81 & 82) and after considering the applicable law, the Court finds that Plaintiff failed to meet her burden of proving medical negligence at trial, and therefore finds in favor of Defendant.

## BACKGROUND

Mr. Dukert was diagnosed with adenocarcinoma of the colon in January 2010, when a malignant mass was found in his cecum. A hemicolectomy was performed one month later.[1] Mr.

---

[1] A hemicolectomy is the removal of the right or left side of the colon. *Stedman's Med'l Dict*. 399380, database updated Nov. 2014. A colonic polyp is extra tissue that grows inside the colon. An adenoma is an abnormal growth of the mucosal cells of the lining of the colon. As it relates to colonic polyps, biopsy is the removal of a sample of

Dukert underwent five more colonoscopies with polypectomy and biopsy at the 35-40 cm level (measured from the anus) of the sigmoid colon for surveillance and treatment of potentially cancerous lesions, on the following dates: April 10, 2012, June 7, 2012, September 7, 2012 and November 14, 2012.  A colonoscopy performed on February 17, 2011 revealed no polyps in the sigmoid colon.  See Deft. Fact 80.  All of the procedures were performed at the VA Hospital in Albuquerque, New Mexico.  All of the polyps subsequently found and treated were found to be benign. The sixth procedure was done on February 15, 2015, during which doctors attempted to remove a residual or recurrent benign (non-cancerous) polyp and treated the residual polyp with argon plasma coagulation ("APC") instead of only taking a biopsy of the polyp.[2]  Mr. Dukert suffered a perforation of his sigmoid colon as a result of this procedure in the area where the polypectomy was performed.

    The perforation was discovered when Mr. Dukert became very ill with fever, chills, nausea and vomiting two days after the procedure.  He was seen in the emergency room at the Sierra Vista Hospital in Truth or Consequences, New Mexico, where imaging identified a perforation of the sigmoid colon at the site of the February 15, 2013 polypectomy.   He was diagnosed with acute sepsis and airflifted to Del Sol Medical Center ("Del Sol") in El Paso, Texas for emergency surgery to repair the colon perforation.  Following corrective surgery for the colon perforation, Mr. Dukert suffered multiple complications including deep vein thrombosis, cardiac and renal dysfunction and prolonged intubation for respiratory distress.  On March 27, 2013, Mr. Dukert was discharged from Del Sol to Casa de Oro, a skilled nursing

---

body tissue (polyp) for examination; pathology refers to the laboratory examination of samples of body tissue; and histology refers to the microscopic structure of the polyp.  *See*, generally, testimony of Drs. Lin and Kolendich, Doc. 78 (Trial Transcript, or "TR").

[2]  Based on the testimony at the hearing, cautery with argon plasma coagulation is a medical endoscopic procedure used primarily to control bleeding from certain lesions in the gastrointestinal tract.

facility in Las Cruces, N.M. for rehabilitation and monitoring, and remained there until May 31, 2013, after which Mr. Dukert received physical and occupational therapy and home health nursing for ostomy care.

On July 9, 2013, Mr. Dukert had an acute onset of nausea and vomiting, which was diagnosed as small bowel obstruction. He was transferred to Mountain View Regional Medical Center in Las Cruces, where he underwent surgery. He was discharged on August 2, 2013, but then readmitted the following day when he had profuse bleeding in his wound area. Mr. Dukert was discharged from Mountain View Regional Medical Center on August 7, 2013 and readmitted again on August 15, 2013, where he died a week later on August 22, 2013.

Plaintiff, Mr. Dukert's wife, filed this lawsuit as personal representative for her husband's estate, asserting claims against the Defendant under the Federal Tort Claims Act, 28 U.S.C. §§1346(b) and 2671 et seq. She contends that her husband's death was the result of medical negligence that occurred during the February 15, 2013 colonoscopy. Defendant contends that his death was caused instead by cardiorespiratory arrest secondary to severe metabolic acidosis secondary to septic shock, and related to multi-organ failure. The Court next describes the parties' positions so as to put its factual findings in proper context.

## I.      Parties' Positions

Plaintiff claims that the doctors who performed the February 15, 2013 polypectomy, Dr. Henry Lin and Dr. Brian Story, failed to follow the accepted standard of care for the treatment and surveillance of residual polyps by performing colonoscopic polypectomy after multiple prior similar procedures in the same location, instead of performing abdominal surgery. Plaintiff also contends that these doctors failed to provide competent care and safe excision during that procedure which resulted in the perforation of Mr. Dukert's colon and eventually his death.

Plaintiff contends that Mr. Dukert underwent too many colon biopsies and also that the use of argon plasma coagulation ("APC") during Mr. Dukert's February 15, 2013 procedure was inappropriate because it increased the risk of perforation.

Defendant's position is that Dr. Lin and Dr. Story were not negligent in offering Mr. Dukert the non-surgical option as well as the surgical option. Mr. Dukert had a history of colon cancer along with recurrent polyps, and Mr. Dukert was at high risk for surgical intervention given his super obesity and serious comorbities[3] that affected every major organ of his body, and also because Mr. Dukert was opposed to surgery after having experienced adverse effects following his 2010 hemicolectomy. Defendant maintains that it was appropriate for Mr. Dukert to undergo surveillance colonoscopies and necessary to remove the polyps found in the last two procedures because they were possibly precancerous in nature. Defendant also contends that, based on the testimony at trial, APC has been found to be an effective and safe method in the management of polyp remnants in the colon, and that perforation was an unfortunate complication of Mr. Dukert's last endoscopic procedure but was not the cause of his death.

During the two-day trial, testimony was presented by witnesses including Plaintiff's expert Dr. Theodore Coutsoftides, a colorectal surgeon, and defense expert Dr. James Edward Martinez, a gastroenterologist. The gastroenterologists who performed the last two colonoscopic procedures—(1) Dr. Henry Lin, an attending gastroenterologist and supervising endoscopist, (2) Dr. Kevin Kolendich, an attending gastroenterologist, and (3) Dr. Brian Story, who was finishing up a fellowship in colonoscopic procedures at the VA, also testified at trial. Dr. Kolendich and Dr. Story testified at trial by videoconference. Two other witnesses testified at trial, the Plaintiff and Mr. Howard Schroeder, who was Mr. Dukert's former employer and close friend.

---

[3] "Comorbidities" refers to the simultaneous presence of two or more chronic medical conditions or diseases.

## II.      Legal Standard

The Federal Tort Claims Act ("FTCA") includes a limited waiver of the federal government's sovereign immunity. It allows a claimant to be awarded damages for personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of employment under circumstances where the United States, if it were a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b)(1) and 2674. Under the FTCA, the Government's liability is to be determined by applying the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).  It is undisputed that the VA physicians were employees of Defendant and that they were acting within the scope of employment, for purposes of jurisdiction under the FTCA.

In actions brought against the United States under the FTCA, the district court must look to and apply the law of the place where the negligent or wrongful acts occurred. *Estate of Trentadue ex rel. Aguilar v. U.S.*, 397 F.3d 840 (10th Cir. 2005).  In New Mexico, in order to prove medical malpractice, a plaintiff has the burden of showing that (1) the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the duty by departing from the proper standard of medical practice recognized in the community; and (3) the acts or omissions complained of proximately caused the plaintiff's injuries.  *Blauwkamp v. University of New Mexico Hosp.*, 114 N.M. 228, 231 (N.M.App.,1992) (citing SCRA 1986 13-1101 (Repl. 1991)). Doctors in New Mexico must exercise a duty of care consistent with a reasonably well-qualified healthcare provider "practicing under similar circumstances, giving due consideration to the locality involved." NMRA UJI-Civ.13-1101. A doctor "does not guarantee a good medical result. An unintended incident of treatment [or a] poor medical result is not, in itself, evidence of

any wrongdoing by the [doctor]. Instead, the patient must prove that the poor medical result [or the] unintended incident of treatment was caused by the doctor's negligence." NMRA UJI-Civ 13-1112.

There are several areas of contention which form the basis for Plaintiff's medical negligence claims and on which this case turns: (1) Mr. Dukert's opposition to surgery; (2) the appropriateness of surgery given his multiple medical problems, and (3) the use of APC during the February 15, 2013 procedure.  The following are the Court's findings and conclusions on these issues.

## FINDINGS OF FACT[4]

*Surgery versus Endoscopy*

1. Mr. Dukert was a 62-year-old non-service connected male veteran patient at the VA Medical Center in Albuquerque. He entered military service in the United States Army on May 28, 1970, and separated from military service, with an honorable discharge, on December 23, 1971.  Deft.. Fact 43.

2. Mr. Dukert moved to New Mexico from Michigan in 2007 and was employed full-time locally as a truck repair mechanic and driver.  He stood 5'10" tall.  Between 2010 and 2012, his weight varied between 358 and 382 pounds.  During that time period, his body mass index ("BMI") varied from 50 to almost 55, which placed him in the category of "super obese."  Deft.. Facts 44 & 45, Testimony of Dr. Lin, TR at 304:11-23.[5]

---

[4] Because the Court concludes in the end, that Plaintiff has not met her burden for the claims asserted in this lawsuit, the Court herein adopts Defendant's detailed findings. For ease of reading, the Court will note the fact number from which the findings are taken at the end of each Court finding.  Also for ease of reading, citations for the source of supporting testimony or exhibits may not be referenced in their entirety, since the parties' post-trial proposed findings and conclusions include this information.

[5] Body Mass Index, a measure of body fat based on height and weight.  A BMI of 25 to 29.9 is overweight; a BMI of 30 to 39.9 is obese; a BMI of 40 to 49.9 is morbidly obese, and a BMI of 50 or more is super obese, which is the highest level of risk medically.  (TR., p. 305, lines 5-11.)

3. In January 2010, Mr. Dukert was diagnosed with colon cancer. In addition to the malignant tumor, the VA surgeon also identified one small polyp at the ileocecal valve; one large and three medium sized sessile polyps in the transverse colon, and one large sessile polyp in the sigmoid colon. All polyps were completely removed endoscopically or surgically in 2010, which was confirmed by the Pathology Report. Mr. Dukert never again developed a sessile polyp greater than 2 cm. Mr. Dukert had diseases in multiple organ systems. His other serious health issues included diabetes, blood pressure problems, chronic kidney disease, gout, hyperlipidemia, vascular problems, sleep apnea, super obesity with a BMI of 52-53, respiratory issues requiring home oxygen, supraventricular tachycardia, and a history of colon cancer with hemicolectomy. Deft.. Fact 8, testimony of Drs. Kolendich, Martinez & Lin, TR at 345:1-4; 600:3-10; 305:14-17.

4. Colonoscopic perforation is a well-recognized and serious complication following lower gastrointestinal endoscopies, but it occurs very rarely. Perforation as the result of diagnostic colonoscopy has been reported in less than 0.1% of cases and perforation occurs after colonoscopic polypectomy in about 0.2% of cases. Deft. Fact 9; Pltff. Ex. 27.

5. In its role as gatekeeper, the Court takes no issue with the qualifications of any of the experts who testified at trial. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (Rule 702 gatekeeping duties of the trial judge apply to all expert testimony). However, in this bench trial, the Court also assumes the role of fact finder weighing the evidence of the witness, including expert witnesses, and finds that the weight of the evidence leans in favor

of Defendant's expert, Dr. Martinez.  The Court also finds that the testimony of Mr. Dukert's treating physicians is consistent with Dr. Martinez' testimony.[6]

6. Plaintiff's expert, Dr. Coutsoftides is a colorectal surgeon and not a gastroenterologist. Defendant's expert, Dr. Martinez, is a board certified gastroenterologist who practices in the Albuquerque area.  Dr. Lin is a board certified gastroenterologist and at all times relevant was the Chief of Gastroenterology at the Raymond G. Murphy VA Medical Center ("VA"). Drs. Kolendich and Story are board certified gastroenterologists who formerly worked at the VA.  Deft. Fact 14.

7. Gastroenterology and colorectal surgery are different medical specialties that require separate boards, and doctors must perform more endoscopies to pass gastroenterology training than colorectal surgeons have to perform to pass colorectal surgery training.  Deft. Fact 15, TR 111:5-14.

8. Gastroenterologists typically perform many more colonoscopies than colorectal surgeons. Dr. Coutsoftides testified he has performed an average of approximately 250 colonoscopies a year over his career. In comparison, Dr. Henry Lin testified that he performs over 1,500 colonoscopies a year and Defendant's expert, gastroenterologist Dr. James Martinez, testified he also typically performs 1,500 colonoscopies per year.  While both gastroenterologists and colorectal surgeons may perform endoscopic procedures and are held to the same standard of care when performing colonoscopies, gastroenterologists undergo more specialized and more extensive training in endoscopic procedures, including colonoscopy.  Gastroenterologists also regularly employ newer, more advanced techniques in caring for the patient's colonic health than do colorectal surgeons. Deft. Facts 18, 20 & 21, Testimony of Dr. Coutsofides,

---

[6]  The Court adopts Defendant's findings as to the qualifications of Dr. Martinez as an expert, and as to the extensive experience and professional background of Dr. Lin.  *See* Deft. Fact 19.

TR at 37:11, Dr. Lin, TR at 285:4-5; 494:15; 495:13 and Dr. Martinez, TR at 500:10 & 502:20-23.

9. Endoscopy is the use of narrow, flexible lighted tubes with built-in video cameras (endoscope), to visualize the inside of the intestinal tract. Colonoscopy is one type of endoscopy. Colonoscopy is a diagnostic and sometimes therapeutic procedure in which a flexible tube that is equipped with a camera at the end is introduced into the colon (large intestine) for the purpose of examining the lining of the colon. If abnormal areas are found, the endoscopist can take a sample of the tissue (biopsy) or remove the entire abnormality (resection of the lesion, a/k/a removal of the polyp). Deft. Fact 16.

10. Measurements from the rectum regarding location of polyps in the colon are inaccurate because the colon is very stretchy and elastic.  Deft. Fact 27.

11.  A polypectomy is the removal of a polyp. A pedunculated polyp is a polyp with a stalk that looks similar to a mushroom; these polyps are readily amputated with a wire snare placed and tightened around the stalk of the polyp. A sessile polyp is a flat polyp that may be resistant to such amputation with a wire snare. If attempts at saline injection to raise up the sessile polyp to aid in removal are unsuccessful, then piecemeal polypectomy is the standard of care for removal of a sessile polyp. During piecemeal polypectomy, a biopsy forceps, which is a tiny tool, is repeatedly used to "bite off" pieces of visible abnormal tissue until the entirety of the visualized polyp is removed. Deft. Fact 28.

12. The intestine has four layers. The body replaces the mucosa (lining) in the colon, which is nearly transparent, every three days. Below the mucosa is the submucosa, which has feeding blood vessels that run halfway down. After a polypectomy, a healing response is initiated in the colon, resulting in a scar. The visible scar is a sign of completed healing. However, in

removing polyps, the endoscopist is working above the scar, in the mucosa, which is why none of Mr. Dukert's pathology samples contained scar tissue. When the endoscopist no longer sees the blood vessels but sees only a scar, that scar is between the blood vessels and the mucosa.  Deft. Fact 33, Testimony of Dr. Lin, TR at 276:11-18.

13. The instruments used by the endoscopist are very tiny. The biopsy forceps cannot remove tissue deeper than the mucosa.  Deft. Fact 34, Testimony of Dr. Lin, TR at 292:1-10.

14. The most common types of adenomas are called tubular adenomas. Tubular adenomas look different under the microscope from the normal lining of the colon, with glands that look like simple tubules. Testimony of Drs. Lin and Kolendich.70

15. "Inking" or "tattooing" is a method of marking a general site or area of the colon where a polyp has been removed. Tattooing does not pinpoint a specific site of a previous polyp.  In contrast as to what is generally understood from tattooing on the surface of the skin, there is a fairly large area that is discolored.  Deft. Fact 26, Testimony of Drs. Lin & Kolendich, TR at 317:10-319:12;355-357.

16. It is recommended that patients with sessile adenomas that are removed piecemeal should be considered for follow up at intervals of 2 to 6 months to verify complete removal, and afterwards, surveillance should be individualized based on the endoscopist's judgment.  Deft. Fact 29, Pltff's Ex. 29 (2006 colonoscopy surveillance guidelines). The medical providers at the VA followed this recommendation.

17. The most common types of adenomas are called tubular adenomas. Tubular adenomas look different under the microscope from the normal lining of the colon, with glands that look like simple tubules. Deft. Fact 37, Testimony of Drs. Lin and Kolendich, TR at 298-299.

18. A second type of adenoma is called villous adenoma. Just as tubular adenoma looks different from normal tissue, villous adenoma looks totally different from tubular adenoma. These two tissue types are distinct not only because of their different appearance but also because they have different biology. The villous type has elongated glands that have a fern-like growth pattern and a higher risk of cancer. Deft. Fact 38, Testimony of Dr. Lin, TR at 329:18-23

19. A third type of adenomatous polyp has a mixture of tubular and villous patterns and is called tubulovillous adenoma. Like villous adenoma, this is also considered a high risk histology (microscopic structure at risk of becoming malignant in the future).  However, whether it is a tubular, villous or tubulovillous adenoma, it is still a benign tumor, meaning a neoplasm with malignant potential but not actual malignancy. The biology behind the adenomas makes them different, and polyps do not "morph" into other adenomas. Deft. Facts 39, 40, Testimony of Drs. Lin & Martinez, TR at 299:3-8; Testimony of Dr. Kolendich, TR at 370:1-11.

20. Residual polyp is defined as a remnant of a polyp (tumor or cancer) after primary, curative therapy.  A recurrent polyp (also known as recurrence of polyps) is defined as the development of one or more new polyps after a previous polyp has been removed.  Deft. Fact 30.

21. The accepted medical literature provides that, "When there is an indication to examine the entire large bowel, colonoscopy is the diagnostic procedure of choice. It is the most accurate method of detecting polyps of all sizes and it allows immediate biopsy or polypectomy. Most polyps found during colonoscopy can be completely and safely resected, usually using electrocautery techniques. Scientific studies now conclusively show that resecting adenomatous polyps prevents colorectal cancer."  Deft. Fact 17, Bond article, 3054-3055.

22. Prior to undergoing a colonoscopy, patients must undergo a specified colonoscopy preparation to clean out the colon. This preparation usually involves a liquid diet, medication, and drinking copious amounts of fluid, including Golytely. Some patients, especially diabetic patients, frequently have difficulty adequately cleaning out their colons, despite carefully following their doctor's instructions for colonoscopy preparation. Plaintiff testified that Mr. Dukert "absolutely" followed his doctors' recommendations for extended bowel preparation. Testimony of Patricia Dukert.  Despite extended preparation, almost triple what would be required of most patients, Mr. Dukert had difficulty cleaning out his colon prior to his colonoscopies. Deft. Facts 22-24; Testimony of Drs. Lin & Kolendich, TR at 315:25-316:4; 179:5-10; Testimony of Mrs. Dukert, TR at 179:5-17.

23. A patient who repeatedly presents for colonoscopy with a poorly prepped colon would also present similarly for elective colon surgery; so whether the patient had emergent colon surgery after a perforation or whether the patient had elective colon surgery, there would be spillage (of the fecal contents of the colon into the abdominal cavity). Dr. Lin testified that if Mr. Dukert had undergone a colon surgery instead of a colonoscopy on February 15, 2013, there is no medical reason to believe that he could have avoided postsurgical complications. The myriad of surgical complications suffered by Mr. Dukert after the perforation could still have occurred if he had undergone surgery without the perforation.  Deft. Fact 25, Testimony of Dr. Lin, TR at 264:20-23; 264:6-16; 265:23-25.

***Risk of Surgery for Mr. Dukert***

24. Plaintiff alleges that VA doctors should not have given Mr. Dukert any option other than surgical resection of his colon to deal with his residual polyp, despite Mr. Dukert's risk of

12

surgical morbidity (sickness or disease) and mortality (death). *Testimony of Dr. Coutsoftides*, TT at 142:22-143:6.

25. In 2000, John H. Bond, M.D. authored the medical article entitled "Polyp guideline: diagnosis, treatment, and surveillance for patients with colorectal polyps" ("Bond article"); Pltff's Ex. 27. Regarding post-polypectomy ***colonoscopic*** (endoscopic) treatment and surveillance of **"*large sessile polyps (>2 cm)***," the 2000 Bond guidelines state, "If complete resection is not possible after two or three examinations, ***the good risk patient*** should ***usually*** be referred for surgical therapy." (emphasis added).   The American College of Gastroenterology, American Gastroenterological Association, and the American Association for Gastrointestinal Endoscopy, sanctioned Dr. Bond's article in 2003.   The American Cancer Society joined with these same three organizations to produce an updated guideline in 2006 entitled "*Guidelines for Colonoscopy Surveillance after Polypectomy: A Consensus Update by the US Multi-Society Task Force on Colorectal Cancer and the American Cancer Society*."  Deft. Facts 4-7; Pls. Ex. 29.

26. Both the 2000 and 2006 guidelines are authoritative in the field and practice, although there have been continual additional updates to the guidelines in the field of gastroenterology because "knowledge continues." Deft. Fact 5, on testimony of Dr. Lin, TR at 238-241. Authoritative guidelines suggest preferable approaches to medical problems, and are intended to be flexible, versus standards of care that are "inflexible" and rarely violated. Deft. Fact 6, testimony of Dr. Martinez, TR at 511:21-512:1.  Pls. Ex. 27.

27. In 1978, Dr. Coutsofides authored an article, the purpose of which was to propose a plan of management in cases based on "microscopic characteristics so that unnecessary surgery will be avoided."  Deft. Fact 41.

28. The Bond article guidelines state that:

> [t]he patient at high risk for morbidity and mortality from surgery probably should not have surgical resection.  If a malignant polyp is located in that part of the lower rectum that would require an abdominal–perineal resection, local excision rather than a standard cancer resection usually is justified.  (Deft. Fact 42).

29. The Bond article guidelines regarding the appropriateness of surgery is not inconsistent with Dr. Coutsofides' article on the avoidance of unnecessary surgery and its risks.  The Bond article states that the provider must question whether the risk of local recurrence of the cancer is greater than the risk of surgical intervention.  Deft. Fact 42.

30. After his hemicolectomy in 2010, Mr. Dukert was diagnosed only with benign polyps, some of which had the potential of developing into cancer.  Thus, the risk assessment for Mr. Dukert, prior to beginning every surveillance colonoscopy, was an assessment of whether the risk of removing a benign polyp by colonoscopy with polypectomy was greater than the risk of removing it surgically.

31. Because Mr. Dukert had obesity and diabetes, he "had a tremendous propensity for abnormal growth of polypoid tissues." Dr. Lin testified that he was faced with the management decision of what to do to help Mr. Dukert control the polypoid lesions when the patient also has a personal history of colon cancer. Weighing the risks and benefits of treatment is something a gastroenterologist must discuss with a patient like Mr. Dukert. Deft. Fact 13, Testimony of Drs. Lin & Story, TR at 337:8-19; 429:2-430:3.

32. Mr. Dukert had a past medical history of super morbid obesity and every comorbidity that is usually associated with obesity, including type 2 diabetes, hypertension, obstructive sleep apnea, GERD, and colon cancer, chronic kidney disease, cardiac dysfunction (paroxysmal

supraventricular tachycardia and chronic venous insufficiency.  Also, Mr. Dukert's breathing

was impaired such that he was hypoxic and required home oxygen. Deft. Fact 47, Testimony

of Dr. Lin, TR at 335:21-336:18.

33. Obesity increases the risk for chronic kidney disease and its progression to end stage renal

disease. Increased surgical risk and postoperative complications, including wound infection,

postoperative pneumonia, deep venous thrombosis, and pulmonary embolism, are also well

known complications of obesity. The medical complications of obesity are multiplied for the

super morbidly obese patient.  As a result of these serious comorbidities, Mr. Dukert was a

very poor surgical risk. Deft. Facts 46 & 47, Testimony of Dr. Lin, TR at 304-305.

34. Risk assessment involves evaluating the risks of what might occur, not what has already

occurred. Perforation after colonoscopy with polypectomy occurs in 0.2% (2 out of every

thousand cases). APC adds an additional 0.3% risk (3 out of every thousand cases).  *Id.*

Therefore, added together, the risk of perforation for colonoscopy with polypectomy and

APC is 0.5% (5 out of every thousand cases.)  However, surgical data indicates that for

someone who is older with multiple medical problems, surgical mortality can approach 5%

(50 out of every thousand).    Mr. Dukert was a very unique patient who had significant risk

factors.  Dr. Lin testified at trial that medical research from 2011 looked specifically at a

super obese patient's surgical risk profile, i.e. their surgical mortality.   Mr. Dukert was older

than 40; he had morbid obesity for more than five years; he had sleep apnea; he had lung

disease; he had diabetes; and he had dyslipidemia. Mr. Dukert had all six of the risk factors,

which gave him an assigned surgical mortality of 10 to 15 percent (100 to 150 out of 1,000

cases).  Deft. Fact10, Pltff Ex. 27 ("Bond article"); Testimony of Dr. Lin, TR at 256:23-

258:20, 202:4-7; Testimony of Drs. Lin & Coutsoftides, TR at 262:1-3; 277:5-13; 45:17-18; Testimony of Dr. Martinez, TR at 507:19-23.

35. Mr. Dukert had a combined perforation risk with colonoscopy, polypectomy, and APC of no more than 0.5% (5 out of every 1,000 cases); a mortality risk from perforation of 0.125% (1¼ out of every 1,000 cases), but a surgical mortality risk of 10-15% (100-150 out of every 1,000 cases). Mr. Dukert's risk of dying following surgery was 80-120 times higher than his risk of dying from a perforation suffered from a colonoscopy with polypectomy and APC. Even "[t]he risk for local recurrence or for lymph node metastasis from invasive carcinoma in a colonoscopically resected polyp is less than the risk for death from colonic surgery." Deft. Fact 11, Pltff. Ex. 27; Testimony of Dr. Lin, TR at 336:21-337:7.

36. Mr. Dukert was not a "good risk patient" referenced in the Bond article, but was rather a high risk patient with multiple comorbidities that made surgery risky. Thus, based on the medical literature, practice guidelines, and the evidence admitted at trial, the Court finds that it was not a greater risk for the VA physicians to perform a colonoscopy with polypectomy.

*Chronology of Procedures*[7]

37. Mr. Dukert underwent six colonoscopy procedures after the January 2010 procedure and the subsequent hemicolectomy in February 2010. At each colonoscopy (except for the first one in January 2010), Mr. Dukert underwent therapeutic removal of recurrent and/or residual polyps, all of which were non-cancerous polyps.

38. Mr. Dukert's first colonoscopy at the VA on January 18, 2010 revealed a mass at the hepatic flexure which was an adenocarcinoma (cancer) and five smaller benign tubular polyps at other sites in the colon. A large 4 cm. sessile tubular polyp was also located within the

---

[7] The procedures are described in detail in Deft. Fact 80. The Court includes details here regarding site and nature of polyp, the physicians involved in the procedure and the procedure for removal.

sigmoid colon located at about 40 cm from the rectum, and this was removed with a "hot snare." Medical records report that this polyp was completely removed by the VA surgeon. The following month, in February 2010, general surgery performed a hemicolectomy (resection of the colon) to remove the cancerous tumor.

39. After his February 2010 hemicolectomy, Mr. Dukert continued to regularly develop multiple colonic polyps of all polyp types throughout his colon. Deft. Fact 55, Deft. Ex. A1 & A2. His first colonoscopy on January 29, 2010 was performed by Gastroenterology. However, the subsequent three post-surgery colonoscopies (*February 17, 2011; April 10, 2012; and June 7, 2012*) were performed by the General Surgery Department, after which Mr. Dukert was referred back to Gastroenterology for three additional colonoscopic procedures (*September 7, 2012; November 14, 2012; and February 15, 2013*). A chronology of these procedures follows:

a. *February 17, 2011:* the February 2013 colonoscopy revealed no polyps in the sigmoid colon. The procedure was initially set for February 16, 2011, but was cancelled due to poor preparation. On February 17th, in a second attempt, most liquid stool was removed, allowing doctors to proceed with the colonoscopy, performed by the VA General Surgery Department. The purpose of the procedure was to follow up the previously removed 2010 tubular polyp in the sigmoid colon. A repeat colonoscopy in one year after extensive bowel preparation was ordered. Deft. Ex. A3.

b. *April 10 2012:* General surgery performed this second surgical follow-up, which revealed a large tubulovillous adenoma polyp at 35 cm, which was a different pathology from the one removed in 2010. Deft. Ex. A4.

c.  *June 7, 2012:* General surgery performed this colonoscopy, and poor preparation was again noted.  Recurrent adenomatous polyps were noted at 35 cm, which was the "prior polypectomy site," and excised with a snare.  Biopsies indicated that the removed polyp was tubulovillous in pathology, confirming it was a different polyp than the tubular polyp removed in 2010.

d.  After the June 2012 procedure, Mr. Dukert was referred by the surgeon back to Gastroenterology, where he underwent three additional colonoscopies:

e.  *September 7, 2012:* Dukert had this fifth colonoscopy, performed by VA gastroenterologist Dr. J. Barakat.  Bowel preparation was not ideal, but Dr. Barakat was able to remove in its entirety a villous adenoma polyp at 35 cm, which again confirmed that this polyp was different from the others previously removed from the area.  In the same procedure, Dr. Barakat identified another polyp in the area where the colon had been resected in 2010, and this polyp was removed by raising and injecting it.  Dr. Barakat ordered a repeat colonoscopy in three months.  Deft. Ex. A6.

f.  *November 14, 2012:* This follow-up colonoscopy was performed by attending gastroenterologist Dr. Kevin Kolendich. There was a 1.1 cm flat polyp near the inked general site of the three previous attempts to remove the flat polyp (35-40 cm from anus).  Doctors attempted to raise this 1.1 cm polyp by injecting it from multiple angles, but were not successful.  Because the snare could not be used, Dr. Kolendich employed piecemeal removal of the polyp with jumbo biopsy forceps. Histology showed the pieces were fragments of a tubulovillous adenoma, but without cancer or dysplasia. Pathology documented that this was a different polyp than the one removed during the previous colonoscopy. Deft. Ex. A7.

18

g. *February 15, 2013:* Dr. Brian Story, along with Dr. Lin for key portions of the procedure, performed this colonoscopy.  Dr. Story removed two polyps.  One was a tubular adenoma and the other was a 1 cm residual tubulovillous adenoma which was removed piecemeal with jumbo forceps and then by argon plasma coagulation ("APC") in an attempt to destroy any remaining adenomatous tissue at the polyp site. This was done without difficulty or complication.  Unfortunately, within approximately 48 hours of returning home, it was discovered that Mr. Dukert experienced a bowel perforation, a well-known risk of colonoscopy that occurs in a certain percentage of patients in the absence of any negligence. Almost all bowel perforations require surgery, many with colostomy. All bowel perforations, by definition, involve the leakage of bowel waste into the abdominal cavity; and infection (including sepsis) is the most common complication of the bowel perforation. Deft. Ex. A8, Testimony of Dr. Lin, TR at 275:21-23.

### Mr. Dukert's Opposition to Surgery

40. After undergoing the right hemicolectomy for colon cancer in February 2010, Mr. Dukert told VA medical providers a few months later that he had not had a single day in the previous month where he did not have pain. Mr. Dukert reported "[h]e feels depressed because he can't do what he was able to do previously." Between February and September 2010, Mr. Dukert was seen in General Surgery and was sent to Cardiology due to persistent shortness of breath since his colon surgery. He told VA medical providers he had been unable to work and was applying for disability. Deft. Fact 53.

41. Also, after his 2010 colon surgery, Mr. Dukert was no longer able to do the work he had been doing and he had to quit his job. Both Mrs. Dukert and Howard Schroeder, Mr. Dukert's

close friend and employer, testified that Mr. Dukert did not ever fully recover after his February 2010 (hemicolectomy) abdominal surgery. Deft. Fact 54.

42. When Dr. Kolendich first began speaking to Mr. Dukert about surgery prior to the November 14, 2012 procedure, Mr. Dukert "was adamantly opposed to it." Dr. Kolendich testified: "we had discussed his past experiences with his hemicolectomy, we discussed the fact that he had gone over the operative risks with surgery, and we discussed the risks of future colonoscopies and endoscopic attempts, and it [colonoscopy] was his determination, Mr. Dukert's, knowing all these things."  Deft. Fact 72, Testimony of Dr. Kolendich, TR at 409:6-7.

43. Dr. Kolendich's procedure consult note on November 14, 2012 states, "Repeat colonoscopy in 3 months with extended bowel preparation.  If residual polyp remains at 35-40 cm referral to surgery for resection should be [pursued] as multiple attempts have been made at polypectomy at this site with residual polyp remaining." Deft. Fact 69,Ex. A7.

44. Dr. Kolendich's addendum to this report states, "I called the patient and informed him of the results of his endosocpy [sic] and pathogy [sic]. I recommended he undergo repeat colonoscopy in 3 months with extended bowel preparation as there was residual polyp at his previous polypectomy site and 35-40 cm." Deft. Fact 70, Ex. A7.

45. The addendum to Dr. Kolendich's note further states: "I informed the patient that if residual polyp remains at 35-40 cm at the time of his follow-up endosocpy [sic] he will need referral to surgery for resection of the polyp as multiple attempts have been made at polypectomy at this site with residual polyp remaining. He voiced [his] understanding, all his questions were answered to his satisfaction." Deft. Fact 71, Ex. A7; Testimony of Dr. Kolendich, TR at 371, 410.

46. Dr. Kolendich's policy was that "every physician needed to have a conversation with a patient following a procedure." Testimony of Dr. Kolendich, TR at 385:4-20. Because the patient would still be sedated, it was his "strong preference that family be present." *Id.* Dr. Kolendich's practice was to speak with the patient before the procedure and later call the patient when he is no longer under the effects of sedation. *Id.* Dr. Kolendich recalled that Plaintiff (Mrs. Dukert) was present briefly in the post-operative area when he discussed subsequent surveillance and treatment options after the November 14, 2012 procedure. TR at 383:1-10.

47. The November 14, 2012 procedure was the third attempt to remove a tubulovillous polyp at 30-40 cm., with the other two on April 10, 2012 and June 7, 2012, since the medical records do not indicate the presence of tubulovillous polyps in the sigmoid colon prior to the April 2012 procedure. Testimony of Dr. Kolendich, TR at 373:8-9 ("There had now been two colonoscopies with removal of polyp").

48. The referral to surgery was actually a re-referral, since Mr. Dukert had initially been a surgical patient and was then referred to gastroenterology for the subsequent colonoscopies. A referral to surgery did not mean that surgery would definitely be performed. The purpose of a surgical referral was so that "surgeons could re-evaluate [Mr. Dukert] to determine if they felt he was a surgical candidate." Testimony of Dr. Kolendich, TR at 373:1-12.

49. Plaintiff contends that Mr. Dukert should have been treated surgically for this last polypectomy in February of 2013, and claims that Mr. Dukert was never given the option of surgery for the February 2013 follow-up. In proposed post-trial findings, Plaintiff states that Dr. Lin and/or Dr. Story failed to provide Mr. Dukert with surgical options for the appropriate treatment of his residual sigmoid lesion prior to the February 15, 2013

colonoscopy procedure. *See* Pltff's Fact 10.  However, the Court notes that this statement is unsupported by any evidence or testimony presented at trial, and is in fact plainly refuted by evidence and testimony presented by Defendant which supports Defendant's position that both options were discussed with Mr. Dukert.

50. The standard of care also demands that physicians advise patients of the benefits, risks, and alternatives to treatment. It is the physician's duty to make sure the patient is well informed prior to starting a procedure. The requirements of standard of care are to present all the options available to the patient at that point in time. Deft. Fact 12, Testimony of Dr. Lin, TR at 255:17-24.

51. The relevant standard of care demanded that VA physicians inform Mr. Dukert of the risks and benefits of both colonoscopy and surgery, including but not limited to the risk of perforation from colonoscopy that could require subsequent surgery, colostomy, and/or lead to his death.

52. Prior to the February 15, 2013 procedure, Dr. Story discussed the risks, benefits, and alternatives of the procedure, including surgery, with Mr. Dukert in detail, including risks of bleeding, infection, perforation that may require surgery and drug reaction from conscious sedation. Deft. Fact 76, Testimony of Dr. Story, TR at 429:16-20.

53. In addition to meeting with Mr. Dukert before the February 15, 2013 procedure and before he was sedated, Dr. Story also met with both Mr. Dukert (who was alert at the time) and his wife about 15 to 25 minutes *after* the procedure.  He spoke with them "at length" about continued surveillance of his polyps in the event that they hadn't removed the entire polyp. TR at 441, 443-444. Dr. Story explained the potential complications that could come from continuing to do endoscopic surveillance.  Dr. Story testified that he "wanted to make sure

that Mr. Dukert understood all of the potential issues that could come about from the various options he had."  Mr. Dukert felt that due to his other medical issues and his "struggle during his previous surgery for colon cancer in 2010," he simply was not interested in pursuing any sort of surgical treatment, if possible, for any further follow-up.

54.  Dr. Story stated that Mr. Dukert "was quite adamant about it."   Mr. Dukert had explained that he had a "tough go" with his previous surgery and he really didn't want surgery "if at all possible."  Mr. Dukert gave his written consent for the procedure after his questions were answered.  Deft. Facts 76, 79 & 82, Testimony of Dr. Story, TR at 429:16-430:22-431:2;Ex. A8.

55. Both Dr. Kolendich and Dr. Story testified at trial that Mr. Dukert was "adamantly" opposed to the surgery option. At trial, Plaintiff pointed out that there were no medical notes specifically referring to Mr. Dukert's opposition to surgery as "adamant."  However, the Court as fact finder must consider the testimony of witnesses as well and the witnesses' credibility.  The Court finds the physicians who testified regarding Mr. Dukert's opposition to surgery to be credible.  Moreover, the physicians testimony that Mr. Dukert was opposed to surgery makes perfect sense considering that Mr. Dukert never really recovered from his colon cancer surgery in 2010.

56. Dr. Lin, who was present at the February 15, 2013 procedure, generally reviews the patient's medical record and independently goes through the patient's history and physical condition before the procedure and talks to other physicians participating in the procedure about the patient before the procedure. Deft. Fact 75, Testimony of Dr. Lin. TR at 281:14-16 & 22-23.

57. Plaintiff's expert, Dr. Coutsoftides, testified that the standard of care demanded that Mr. Dukert be told "you have another polyp, you should consider seriously surgery. And then

evaluate the patient as a surgical risk, and then decide what they want to do." Deft. Fact 81, Testimony of Dr. Coutsoftides, TR at 74:108.

58. Defense expert, Dr. Martinez, also testified that the standard of care is: that surgery is considered; that the patient's risk factors are evaluated; honoring a patient's desire for surgery or not to have surgery. Deft. Fact 81, Testimony of Dr. Martinez, TR at 571:13-20; 507-508; 512:9-12.

59. Because Mr. Dukert had such a high risk of mortality and morbidity with surgery, because he wished to avoid surgery if at all possible, and because the VA had not yet exhausted all the non-surgical options for polyp removal (i.e., APC), in consultation with the patient, Dr. Lin, Dr. Story, and Mr. Dukert agreed to proceed with one more therapeutic colonoscopy. Deft. Fact 83, Testimony of Dr. Story, TR at 443:2-25.

60. Prior to each and every colonoscopy, VA medical providers advised Mr. Dukert orally and in writing of the risks and benefits of the procedure, including the known risk of bowel perforation, and the alternatives to the procedure, including surgery. Each time, Mr. Dukert chose to undergo a colonoscopy rather than to undergo abdominal surgery. Deft. Fact 7; Ex. A; Testimony of Drs. Martinez, Lin, Kolendich, and Story.

61. Standard of care does not specify the exact number of recommended polypectomies of benign polyps in a high risk patient; the guidelines leave that determination to the professional discretion of the treating physician. Dr. Bond's article states, ". . . decision as to whether to perform colonoscopy for patients with polyps measuring less than 1 centimeter in diameter must be individualized depending on the patient's age, comorbidity, and past or family history of colonic neoplasia." Pls. Exs. 27 & 29 (Bond article and 2006 guidelines).

62. At all times VA physicians provided standard of care treatment: they fully advised Mr. Dukert that he should consider surgery as one of his options and of the risks and benefits of both colonoscopy and surgery; they evaluated Mr. Dukert as a high surgical risk and involved Mr. Dukert in the decision of how to proceed with managing his multiple recurrent polyps and his one residual sessile polyp. After being fully informed of the risks and benefits of both surgery and colonoscopy, Mr. Dukert chose to proceed with colonoscopy rather than another surgery. Deft. Fact 2; Deft. Fact 81; Pls. Exs. 27 and 29.

63. Plaintiff notes that the list of Mr. Dukert's "prior surgeries" listed on the paperwork for the February 15, 2013 procedure indicates that neither Dr. Lin nor Dr. Story were aware of the removal of the large sessile polyp that took place on January 29, 2010. *See* Doc. 75 at 7 (Pltff's Rebuttal to Deft.'s Closing Arg.). Plaintiff argues that because Dr. Lin and Dr. Story had a "flawed understanding" as to the number of Mr. Dukert's previous polypectomies, they erred in making the referral to surgery "just one procedure too late." *Id.* at 8.

64. There is no evidence to support this argument for several reasons. First, Dr. Story testified that he was in fact aware of Mr. Dukert's January 2010 colonoscopy, and the Court finds his testimony to be credible. TR at 426:1-7. He had no explanation as to why the January 2010 colonoscopy was not included in the list of "prior surgeries." *Id.* Second, the evidence shows that the 4 cm sigmoid tubular polyp found during the January 2010 procedure had been completely removed and no polyps were located at this location for almost 24 months, until April 2012 when the next sigmoid polyp was found. Third, it is sheer speculation to argue that Mr. Dukert would have been referred to surgery sooner had the January 2010 procedure been listed on the paperwork. Fourth, based on the evidence and testimony presented at trial, Mr. Dukert was opposed to surgery, notwithstanding an earlier referral for a surgical consult.

Thus, Plaintiff's argument regarding a lack of knowledge by Dr. Lin and Dr. Story about the January 2010 colonoscopy has no merit.

***Use of Argon Plasma Coagulation ("APC")***

65. Dr. Coutsofides testified that using argon plasma coagulation increased the risk of perforation for Mr. Dukert. TT 44:16-45:20.

66. However, Dr. Coutsoftides testified that he could not opine that the use of APC was below the standard of care and he noted there was no significant bleeding at the polyp site.  Deft. Fact 88.

67. Defendant's expert, Dr. Martinez, also testified that he regularly uses APC with his patients and that it was appropriate and correct to use APC for Mr. Dukert. Testimony of Dr. Martinez. Deft. Fact 88, TR at 502:10-13; 517:14016

68. APC is a non-contact electrosurgical procedure that applies thermal heat to control bleeding and eliminate the likelihood of residual polyp tissue. The use of APC increases the risk of perforation by 0.3% (3 out of 1,000), because the provider is applying an additional thermal intervention, so compared to not doing anything at all, there is a slightly greater risk involved with its use.  APC is considered as an effective adjunct therapy that is approved for use in managing colonic polyps.  Deft. Fact 87, Testimony of Drs. Martinez, Lin, and Coutsoftides, TR at 521:20-21; 262;1-3; 45:17-18. Deft. Facts 30-31, 87.

69.  The argon plasma coagulator device has a time- and power-generated depth of penetration; the safety of the instrument is based on the fact that once the viable cells dry up, the current stops flowing. The APC catheter used at the VA has a built-in software program to auto-regulate the settings. Testimony of Dr. Lin.61

70. Plaintiff's expert, colorectal surgeon Dr. Coutsoftides, has at most only used APC a dozen times in the last 10 years. On the other hand, Defendant's expert, gastroenterologist Dr. Martinez, regularly uses multiple techniques, including argon plasma coagulation ("APC"), because he has at least two colonoscopy patients a day with challenging health profiles. Deft. Fact 21.

71. Plaintiff presents no post-trial proposed findings of fact and conclusions of law addressing the use of APC during the February 15, 2013 procedure.  In her written Rebuttal to Defendant's Closing Argument, Plaintiff argues that there was no reason to use APC during the February 15, 2013 procedure since there was no testimony that either bleeding or residual polyps had been present.  Doc. 75 at 9. This statement is inaccurate, since Dr. Martinez, Dr. Lin and Dr. Story testified at trial that APC was used to remove a residual polyp as well as to contain the bleeding at the polyp site during the February 15, 2013 procedure, and the Court finds this testimony to be credible. *See* Testimony of Dr. Story, TR at 437:11-15; 439:17-21 (use of APC was an "attempt to kill any residual polyp cells that may have been left behind despite our forceps removal"; Testimony of Dr. Lin, TR at 109:14-20; 333:16-334:5; Testimony of Dr. Martinez, TR at 526:7-12; 543:3-7; 584-585; 517 at 14-16.

72. The use of APC during Mr. Dukert's February 15, 2013 colonoscopy was within the accepted standard of care for the treatment and surveillance of residual polyps.

73. Mr. Dukert was a super obese patient with numerous serious comorbidities that put him at a high surgical risk of morbidity and mortality.  Despite his high morbidity and mortality risk, Mr. Dukert successfully underwent and recovered from surgery to repair the colon perforation. Deft. Fact 94, Testimony of Dr. Martinez, TR at 546:1-12; Pltff's Exs. 3 & 4.

74. Mr. Dukert suffered a recurrent bowel obstruction after the February 2013 procedure, but Plaintiff has failed to establish that the colon perforation resulting in the February 15, 2013 procedure proximately caused the recurrent bowel obstruction.  In fact, no one can say with certainty what caused it, and it could have been due to previous surgeries or the peritonitis that developed.  Deft. Fact 98, Testimony of Dr. Coutsoftides, TR at 84:23-85:5.

75. No one can trace the bowel obstruction to the surgery that Mr. Dukert underwent to repair the colon perforation because any abdominal adhesion (scar tissue) can cause a bowel obstruction and Mr. Dukert had undergone multiple abdominal surgeries.  Deft. Fact 98, Testimony of Dr. Martinez, TR at 546:18-547:6.

76. The American College of Surgery and the Center for Medicare and Medicaid Services consider postoperative complications to be issues that arise within a 30-day period after surgery. Mr. Dukert died approximately three months after he was discharged from the Casa de Oro Center.  Deft. Fact 95, Testimony of Dr. Martinez, TR at 546:13-17.

77. Plaintiff did not meet her burden of proving that Mr. Dukert's death was the result of the February 15, 2013, colonoscopy or the bowel perforation, rather than from cardiorespiratory arrest and sepsis, multi-system organ failure and metabolic acidosis subsequent to a surgery at Mountain View Hospital and months after he suffered a bowel perforation. Deft. Fact 99, Testimony of Dr. Martinez, TR at 546:1-12; Deft. Exs. A & I, Pltff's Ex. 5.[8]

## CONCLUSIONS OF LAW

1. To prove medical negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the duty by departing from the proper

---

[8]  Prior to trial, the court bifurcated the issue of liability from damages.  Doc. 72.  At trial, Defendant argued that Dr. Coutsoftides was not qualified to give an opinion on damages.  The Court agrees that Dr. Coutsoftides did not have the expertise to on the reasonableness of necessity of Mr. Dukert's medical expenses incurred after his discharge from the VA Medical Center, and that Plaintiff presented no foundation for these expenses at trial.  However, because the Court finds in favor of Defendant on the liability issue, the issue of damages is moot.

standard of medical practice recognized in the community; and (3) the acts or omissions complained of proximately caused the plaintiff's injuries. NMRA UJI-Civ. 13-1111.

2. In a medical negligence case,  a medical negligence case, a plaintiff must prove that a poor medical result or the unintended incident of treatment was caused by the doctor's negligence. NMRA UJI-Civ. 13-1112.

3. Dr. Story and Dr. Lin acted appropriately and within the standard of care and established guidelines in undertaking a follow up colonoscopy with repeat polypectomy on February 15, 2013.  The VA physicians acted appropriately and within the standard of care in all aspects of performing Mr. Dukert's colonoscopy on February 15, 2013, in light of (1) Mr. Dukert's medical condition and super obesity; (2) the significantly greater risk of morbidity and mortality for Mr. Dukert associated with surgery versus colonoscopy with polypectomy; and (3) Mr. Dukert's express wishes to avoid surgery.

4. The standard of care did not require VA gastroenterology physicians to provide Mr. Dukert with *only* the option of surgery for the treatment of his residual sigmoid polyp lesion on February 15, 2013, but rather required VA gastroenterology physicians to fully advise Mr. Dukert of the risks and benefits of *all* treatment options, surgical as well as non-surgical, and this was done by the VA physicians who cared for and treated Mr. Dukert.

5. The standard of care did not *require* VA gastroenterology physicians to refer Mr. Dukert for primary surgical resection of the sigmoid polyp lesion on or about February 15, 2013.

6. The standard of care did not require the VA surgeons to perform a bowel resection surgery on a benign polyp on or about February 15, 2013.

7. Mr. Dukert died on August 22, 2013, due to cardiorespiratory arrest; severe metabolic acidosis and multi organ failure; and severe shock, likely septic.

29

8.  Plaintiff has failed to prove that the acts or omissions of Defendant and the VA physicians proximately caused Mr. Dukert's injuries and ultimately, his death. Mr. Dukert's death on August 22, 2013 was not the proximate result of the perforation of his colon following the February 15, 2013, colonoscopy that occurred six months earlier, but rather from complications from the surgery.

9.  The perforation injury to Mr. Dukert's colon was the result of a well-known medical complication in a colonoscopy and not the result of medical negligence or malpractice; it was an unfortunate complication of his last colonoscopy, but it was not the cause of Mr. Dukert's death.

10. The VA physicians followed practice guidelines and standard of care to vigilantly and appropriately monitor Mr. Dukert's gastrointestinal system to ensure that he would not develop any further malignant lesions in his colon.

11. Plaintiff failed to meet her burden of proof that Defendant breached the duty of care for Mr. Dukert on February 15, 2013.

12. Having found no basis for liability, the issue of damages is moot.  Nevertheless, the Court would find that on the issue of damages Plaintiff failed to meet her burden of proof establishing that subsequent medical bills incurred for Mr. Dukert's treatment were related to the bowel perforation and/or were reasonable in amount and medically necessary as described in NMSA 1978 § 41-5-3; NMRA UJI-Civ 13-1802 and 1804.

13. Defendant United States of America is not liable to Plaintiff, and therefore Plaintiff is not entitled to recover general or special damages in this matter.

14. Any finding of fact that is more appropriately a conclusion of law shall be deemed a conclusion of law.  Any conclusion of law that is more appropriately a finding of fact shall be deemed a finding of fact.

15. A Judgment consistent with these findings and conclusions shall be entered in favor of Defendant United States of America, and against Plaintiff Patricia Dukert, Individually and as Personal Representative of the Estate of Clare William Dukert, in accordance with Federal Rule of Civil Procedure 52(a)(1) and Rule 58.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE